MARSHALL H. ALSWORTH ET AL. v. RICHMOND CEDAR WORKS ET AL.

(Filed 13 September, 1916.)

**1. Deeds and Conveyances—Evidence—Adverse Possession—Boundaries.**

In an action to recover land and for trespass plaintiffs introduced a grant to show title out of the State, and relied upon adverse possession under color of a deed in their chain of title. The land was known as the "desert or H. tract," and the controversy depended upon the establishment of its eastern boundary. There was evidence in plaintiffs' behalf that the line had been run, and so regarded, in accordance with their contention, and they offered in evidence certain deeds to defendant and its immediate grantor, referring to maps of the land produced at the trial by defendant, upon notice, the descriptions in which tended to corroborate plaintiffs' contentions. *Held*, the deeds and maps were competent as evidence in plaintiffs' behalf; and especially as they had been introduced and relied on by the defendant in its action against another party materially involving the location of the same line.

**2. Deeds and Conveyances—Evidence—Boundaries—Admissions Against Interest.**

Where the description of the closing calls in a deed leaves the boundary line indefinite or uncertain, the acts or conduct of a party, or an owner of the land, in his chain of title, against his interest, are properly received in evidence, when pertinent to the inquiry.

**3. Same—Res Inter Alios Acta.**

The introduction of deeds to lands made to the defendant's grantor, which tend to show a boundary line in dispute as claimed by plaintiffs is not objectionable evidence as *res inter alios acta*.

**4. Deeds and Conveyances—Color—Adverse Possession—Other Deeds.**

Where the plaintiff relies on adverse possession of the lands in controversy under a deed as color of title, the exclusion by the court of other deeds to the same land made by a sheriff is immaterial.

**5. Deeds and Conveyances—Color—Adverse Possession—Outstanding Title.**

Where the plaintiff claims the land in dispute under color of title, and continuous adverse possession, from his grantor, his having obtained another or superior outstanding paper title will not of itself, and as a matter of law, be held to break the continuity of the possession.

**6. Deeds and Conveyances—Declarations Against Interest—Evidence—Pleadings.**

Where a boundary line of lands is in controversy it is competent for the plaintiff to introduce a complaint filed by the defendant in an action against a stranger which describes the line in accordance with plaintiffs' contention in the present action, upon the same location of which the defendant's success in his action depended.

**7. Deeds and Conveyances—Adverse Possession—Constructive Possession—Entire Tract.**

Where the plaintiff claims title to lands by adverse possession under color of title, and thereafter has subdivided the tract into smaller lots

2—172

for convenience in selling the same, his possession of a part of the entire tract will be deemed to extend to the outer boundaries of his deed, when the controversy is not between the plaintiff and purchasers of the lots subdivided, but between him and a claimant of the entire tract.

**8. Instructions—Trials—Deeds and Conveyances—Boundaries—Burden of Proof.**

In this action to recover land and for trespass the court properly charged the jury that the burden of establishing a certain boundary line as contended for by plaintiffs was upon them; and if they failed therein, to find for the defendant, in accordance with its contention that the line was a straight one from the last to the first call in plaintiffs' deed.

CIVIL ACTION for the recovery of land and for damages for trespassing thereon, tried before *Bond, J.,* at February Term, 1916, of PASQUOTANK.

Plaintiffs claimed the land under color of title and adverse possession, the court having ruled that two of the deeds necessary to establish a documentary title from the State by grant and mesne conveyances were invalid and, therefore, the chain of title was broken at that point by the insufficiency of these links to connect their title with that of the State. In order to show that the title was out of the State, plaintiffs introduced in evidence a grant from the State to one John Hamilton, dated 27 December, 1792, and they also offered evidence tending to show that they, and those under whom they claimed, had been in adverse possession of the land for more than twenty-one years under color of title. They further contended, and there was proof to show, that the title had not only passed out of the State, but by reason of their adverse possession, under color, for twenty-one years, or, at least, for seven years, they had themselves acquired the title. They put in evidence a deed from John Hamilton, the State's grantee, to John McKinney, and a deed from the latter to Cathcart and Johnson, and also deeds from Charles Grice, sheriff, to Aaron Albertson, executed 8 September, 1912, under a sale for taxes, which described "all of the Terry land or Great Park estate, including the Heimick and Alsworth land," as shown on the court map, which embraced the John Hamilton tract, and also a deed from John Poole, sheriff, to Joseph B. Skinner, dated 10 September, 1818, executed under a tax sale, and a deed from Joseph B. Skinner to T. L. Skinner, and then showed a connected paper title, consisting of many mesne conveyances, from Joseph B. Skinner to themselves. They also offered proof tending to show the location of the John Hamilton land as acquired from the State, and also proof as to the location of the lands described in the deeds, with further proof that the land described in the complaint was embraced by that described in the grant and deeds, and that defendants had trespassed thereon. The jury rendered the following verdict in answer to the issues submitted by the court:

1. Is all the land claimed by Heimick and Alsworth *et als.,* plaintiffs, described in complaint, inside of the boundaries of the John Hamilton patent, No. 78? Answer: "Yes."

2. Are the plaintiffs Heimick, Alsworth, and others, according to their respective interests, the owners of and in possession of the tract of land described in the complaint? Answer: "Yes."

3. Did the defendants Atlantic Lumber Company, Tilghman Johnson, and Elijah Edge, wrongfully trespass on said lands, as alleged in the complaint? Answer: "Yes."

4. Did the defendant Richmond Cedar Works trespass on said lands, as alleged in the complaint? Answer: "Yes."

5. What damage, if any, are plaintiffs entitled to recover of the defendants because of such trespass? Answer: "None."

Judgment was entered thereon, and the defendant appealed.

*Aydlett & Simpson, P. G. Sawyer, and Small, MacLean, Bragaw & Rodman for plaintiffs.*

*Ward & Thompson, Winston & Biggs, Ehringhaus & Small for defendants.*

WALKER, J., after stating the case: While the record and briefs in this case are voluminous, containing nearly three hundred pages, the material questions raised by the exceptions all lie within a narrow compass.

Plaintiffs offered evidence tending to show that the land granted to John Hamilton was, for many years, known as the Desert tract or Great Park estate, the topography of this land and that of the adjoining tracts showing where the eastern boundary of the desert was, and there being marks on the physical dividing line between the two which indicated that it was the boundary. They were unable to trace the closing lines of the Hamilton grant from the head of James Pritchard's millpond, the calls for the same being as follows: "Then bounding on Thomas Redding's and other lines to the first station," or beginning corner, and, therefore, they offered the proof as to the actual location of the eastern lines of the desert with reference to the adjoining lands, and also evidence tending to prove that said line, as represented on the map and as claimed by them, had been well known for many years as the eastern line of the Hamilton grant. For the purpose of further establishing this boundary defendants introduced a deed from Tilghman Johnson and others to the Atlantic Lumber Company, dated 31 August, 1914, and then a deed from the Atlantic Lumber Company to the defendants, the Richmond Cedar Works, and also the maps attached to each of these deeds, they being alike. The deeds, and the maps annexed thereto and

referred to therein, showed the eastern line of the John Hamilton grant to be as contended by the plaintiffs. The deed to the Atlantic Lumber Company and the one from it to the Richmond Cedar. Works, with the maps annexed thereto, were produced by the last named defendant upon notice from the plaintiff, and the latter offered them in evidence. Defendant objected to their introduction upon the ground that, while they were in its possession and produced by it at the trial, they were not competent as an admission of the location of the eastern line of the Hamilton land, as defendant Richmond Cedar Works was not a party to the deeds and did not have the maps prepared, and, therefore, they were *res inter alios acta* and incompetent as hearsay.

The fact that the maps attached to the two deeds were called for therein and were in possession of the Richmond Cedar Works, and represented the Heimick and Alsworth tract and the Proctor tract, as plaintiff contended they were located on the ground, was a circumstance for the jury to consider as to the true eastern line of the Hamilton grant, and the maps were clearly competent as evidence, when it is considered that the Richmond Cedar Works used them in its suit against the Foreman-Blades Company to recover damages for a trespass on the Proctor tract. They were not entitled to the damages they recovered, and claimed, if the closing calls of the Hamilton grant should be rejected for uncertainty, and the last line should be run directly from the head of Pritchard's millpond to the head of Pasquotank River. This evidence is competent as an admission by conduct and representation that the eastern line of the Hamilton grant had been correctly located by plaintiff. The eastern line of the Proctor tract, which was a part of the Hamilton land, could not be as represented by the maps annexed to the two deeds, if this were not so. "The general rule is that all a party has said (or done) which is relevant to the questions involved in the trial is admissible in evidence against him. 10 R. C. L., 959." The declarations or confessions of the person making them are evidence against such person and all claiming under him by a subsequent title, and for the plainest reasons. Truth is the object of all trials, and a person interested to declare the contrary is not disposed to make a statement less favorable to himself than the truth will warrant; at least there is no danger of overleaping the bounds of truth as. against the party making the declarations. It is therefore evidence against him. *Guy v. Hall,* 7 N. C., 150; *Byrd v. Spruce,* 170 N. C., 429. We said in *Smith v. Moore,* 142 N. C., 277, 287: "The rule as thus established is said to be founded on a knowledge of human nature. Self-interest induces men to be cautious in saying anything against themselves, but free to speak in their own favor. We can safely trust a man when he speaks against himself; and the law, in this instance, substitutes for the sanction of a

judicial oath the more powerful motive arising out of the sacrifice of a man's own interests. This natural disposition to speak in favor of rather than against interest is so strong that when one has declared anything to his own prejudice his statement is so stamped with the image and superscription of truth that it is accepted by the law as proof of the correctness and accuracy of what was said, and the fact that it was against interest is taken as a full guaranty of its truthfulness in place, not only of an oath, but of cross-examination as well, they being the usual tests of credibility. A discussion of this rule of evidence, which shows how thoroughly it has been adopted by the courts, whether the declarations are in the form of mere words or written entries, will be found in 1 Greenleaf Ev. (16 Ed.), secs. 147 to 154; 2 Wigmore Ev., secs. 1455 to 1471; McKelvey on Ev., pp. 254 to 261."

It was competent to show that defendant had claimed the eastern boundary of the Hamilton grant to be the same as the lines now claimed by the plaintiff to be such boundary, and to identify the tract on the map known as the Heimick and Alsworth land. The questions specified in exceptions numbers 9, 10, 24, 25, 26, 28 to 41 (inclusive), and 51, were competent and relevant, and the answers to them could in no way have improperly prejudiced the defendants. The exceptions are hardly entitled to serious discussion. If there was any technical error, it was so slight or immaterial as to have done no harm. Besides, the other evidence as to the true location of the eastern boundary of the Hamilton land was so pronounced and conclusive in its nature as to attenuate very greatly those exceptions and deprive them of any practical force. The complaint in the suit of the Richmond Cedar Works v. Foreman-Blades Lumber Company was competent to show the claim made by the Cedar Works Company as to the location of the Proctor tract, it having an important relevancy to the principal question, viz., the location of the eastern boundary of the Hamilton land, the Proctor tract being covered by the Hamilton grant and its eastern boundary being coincident with a part of the eastern boundary of the Hamilton land. It, at least, strongly tended to show the error of the defendants' contention that the last line of the Hamilton grant should be run from the head of Pritchard's millpond to the head of the Pasquotank River. The sheriff's deeds were ruled out by the court, and are immaterial, as plaintiffs claim, not by a paper title from the State, and intermediate owners, but by adverse possession under color. If the tax deeds were void, therefore, as the court ruled, they could not affect the question of possession, for the grantee, and those succeeding him, held it under color. Nor is there anything in the position that the time during which Timothy Ely held the land, from 16 May, 1882, under his deed from William Underwood, to 22 April, 1884, when he took the deed from the commissioners who

sold under the Underwood mortgage to Cannon and Warren, should be excluded from the count as to adverse possession, because Timothy Ely had color of title all the time from 16 May, 1882, in the Underwood deed to him, and held possession under it, and the mere fact that Underwood may not have had the title at the time his deed was made does not affect its character as color of title, which is defined to be a deed or instrument which purports or professes to pass title, but which it fails to do, either from want of title in the grantor or from some defect in the mode of conveyance. *Tate v. Southard,* 10 N. C. (3 Hawks), 119; *Dobson v. Murphy,* 18 N. C. (1 Dev. and Bat.), 586; *McConnell v. McConnell,* 64 N. C., 342; *Lumber Co. v. Richmond Cedar Works,* 165 N. C., 83; *Seals v. Seals, ibid.,* 409; *Burns v. Stewart,* 162 N. C., 360. This Court said in *Seals v. Seals, supra,* at p. 413: "It can make no difference that the deed, claimed to be color, does not in fact pass the title. It is sufficient if, on its face, it professes to do so, and defendant is in possession, claiming *bona fide* under it adversely. Color of title is that which in appearance is title, but which in reality is not title. No excessive importance is to be attached to the ground of the invalidity of a colorable or apparent title, if the entry or claim has been made under it in good faith. A claim to property under a conveyance, however inadequate to carry the true title, and however incompetent the grantor may have been to convey, is one under color of title, which will draw to the possession of the grantee the protection of the statute of limitations." *Wright v. Matteson,* 18 How. (U. S.), 50; *Beaver v. Taylor,* 1 Wall. (U. S.), 637; *Cameron v. U. S.,* 148 U. S., 301, and other cases in our own Reports. "The very act of claiming title by virtue of an adverse possession for the statutory period precludes the idea of a valid paper title. So do the words 'color of title.' It is evident, therefore, that the requirements as to color of title are sufficiently complied with by a possession held under an instrument which, as a conveyance, is in fact either voidable or void." 1 Ruling Case Law, p. 712. 2 C. J., 169, and cases cited. This is the settled doctrine of the courts in regard to color of title, which an adverse possession for the time prescribed by the statute may ripen into a good and sufficient title. It therefore makes no difference that Ely took another title, or even a better title, afterwards from the commissioners, as they did not deprive him of the right to claim under his color. *Chatham v. Lansford,* 149 N. C., 363; 1 R. C. L., sec. 4, p. 725.

Plaintiffs state the applicable principle in their brief: "The fact that Ely took a deed which was void for want of title in the grantor, William Underwood, in 1882, under which he entered, and thereafter took another void deed from the commissioners in 1884, did not affect the character of his possession as adverse to defendants, since 'it is not the instrument

which gives the title, but adverse possession under it for the requisite period with color of title.' It therefore becomes immaterial how many deeds Ely had, or whether there was any privity between them as against the defendants, if he entered into possession under one and remained in possession under the first deed for the requisite period."

The subject is fully discussed in 1 Cyc., 1082. Colorable title, then, in appearance is title, but in fact is not, or may not be, any title at all. It is immaterial whether the conveyance actually passes the title to property, for that is not the inquiry. Does it appear to do so, is the test; and any claim asserted under the provisions of such a conveyance is a claim under color of title, and will draw the protection of the statute of limitations to the possession of the grantee if the other requisites are present. *Dickens v. Barnes,* 79 N. C., 491.

"A deed, though it be defective, will constitute color of title." So the rule is broadly stated in a very large number of decisions that a deed purporting to convey the land in controversy will give color of title to a possession taken under it, even though it be void. And a deed void for matters dehors the instrument will constitute color of title, provided it purports to convey the land in controversy. 1 Cyc., 1085-1087. See, also, for full treatment of the question, *Seals v. Seals,* 165 N. C., 409, as to fraudulent deeds, and 1 Cyc., 1007 and 1092. Nor can we hold, as matter of law, that taking the deed from the commissioners under the mortgage sale broke the continuity of possession by the plaintiff. They could claim under the Ely deed, as color, notwithstanding their purchase from the commissioners; and whether they did so, or abandoned their adverse possession, was a question for the jury. We decided this point in *Roper Lumber Co. v. Richmond Cedar Works,* 168 N. C., 344, as appears by the second and third headnotes: "A party in possession of lands under a deed may buy in an outstanding claim of title to them without acknowledging paramount title in his subsequent grantor or interrupting the continuity of possession under his first deed; and where adverse possession is sufficiently shown under his first deed, for the period of time limited, it will ripen his title under color thereof, unless he has in some way been estopped or precluded from doing so. Where one claiming title to lands has bought in outstanding titles thereto and claims by adverse possession under his first deed, it is competent to show his acts and declarations as evidence of the character of his possession, and it is for the jury to determine upon all the evidence whether his possession continued to be adverse under the first deed, and sufficient to ripen his title into a good and sufficient one for the time fixed by the statute." With the exception of at least one decision, in which it has been broadly ruled that the purchase of an outstanding title or interest by the adverse claimant interrupts the continuity of his possession, it

seems to be very generally conceded that an adverse occupant may purchase an outstanding title without thereby interrupting the continuity of his possession. A party, it is said, may very well deny the validity of an adverse claim of title, and yet choose to buy his peace at a trifling or small price rather than be at great expense and annoyance in litigating it. The reason for this rule is based upon the principle that the adverse occupant has a right to quiet his possession and protect himself from litigation in any lawful mode that appears to him most advantageous or desirable. 1 Cyc., 1016; *Cannon v. Stockman,* 36 Cal., 535; *Mather v. Walsh,* 107 Mo., 121; *Omaha, etc., L. and T. Co. v. Hansen,* 32 Neb., 449. These cases and others of the same tenor are cited and reviewed in *Roper Lumber Co. v. Richmond Cedar Works, supra.*

The mere subdivision of the tract of land into numerous lots, as shown only on a map of the premises, which was prepared by the parties in contemplation of a sale by lots or small parcels, did not prevent plaintiffs' actual adverse possession of a part of the land from extending by construction of law to the whole thereof. The land was conveyed to plaintiffs, and those under whom they claim, as one entire tract by a single outside or common boundary and by reference to prior deeds, notably the one of Harvey Terry to Thomas H. Robbins, which described the premises as one undivided tract. It was held in *Surghenor v. Ducet,* 139 S. W. Rep., 22, that if there is actual possession of any part of the land described in a deed, it amounts to constructive possession of the whole, where there is a conflicting claim to an entire tract embracing four paper subdivisions, which were made by an administrator for convenience in effecting a sale, and that defendant's actual possession of three of said parts will, under the rule, extend constructively to the fourth, although no inclosure or improvement was upon it. 2 Corpus Juris, 238 and 240, sec. 518, and cases cited in note 76. *Gregg v. Forsyth,* 65 U. S. (24 How.), 179; *Kerr v. Nicholas,* 88 Ala., 346; *Hornblower v. Banton,* 103 Me., 375; *George v. Cole,* 109 La., 816; *B. Imp. Co. v. Needringhaus,* 72 Am. St. Rep., 269; *Bacon v. Chase,* 83 Iowa, 521. In the *Gregg case* the Court, referring to the inquiry whether Ballance occupied adversely the premises described in the patent, said: "The fact is that he did, but he did not reside upon every square yard of the premises, nor upon the particular lot. Nor was this necessary. He resided upon the legal subdivision described in the patent, the evidence of his title, and possessed and occupied it by himself and tenants. We think the laying out of the land into town lots did not deprive him of the benefit of the statute of limitations of 1835 as to all the fractional quarter, except the particular lot upon which his house stood." See, also, 1 Cyc., 1128 and 1129.

It must be noted that the defendant does not claim any one or more of the lots or subdivisions of the land, but is asserting title to the whole

thereof as against the plaintiffs, and it is perfectly evident that plaintiffs have claimed to hold the *entire* tract under their color, and not merely the separate parcels of the subdivisions, each by a distinct and actual possession applicable to it. This is not a controversy between plaintiffs and any of the purchasers of the separate lots, but between them and a party who claims it all.

We have read the charge of the court very carefully, and find nothing in it of which the defendants can well complain. It was a clear and even lucid statement of the law as applicable to the evidence and to the facts as they might find them therefrom. Neither the substance of the charge nor the manner of delivering it to the jury discloses anything contrary to the law which is prejudicial to defendants. The jury were told that the burden was on plaintiffs to locate the eastern boundary of the Hamilton land, and if the jury could not, upon the evidence, locate the various closing lines called for in the grant and deeds, they would run straight from the head of Pitchard's millpond to the head of Pasquotank River. This was according to defendant's own contention. There is nothing in the record to indicate any leaning of the judge towards the plaintiffs or any intimation by him as to how the facts should be found by the jury, but, on the contrary, the charge was fair and impartial.

The court properly refused to charge that there was no evidence of twenty-one or even of seven years continuous adverse possession by plaintiffs and those under whom they claimed, because there was ample evidence of both, and with the exception of the matters of law we have specially considered, the case involved no more than a question of fact for the jury; and as upon the law, which was correctly stated to them, and the evidence, the jury found the facts adversely to the defendants, we must accept that finding as conclusive.

There is no error in the record, and we, therefore, affirm the judgment. No error.